Filed 3/28/13  P. v. Rodriguez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS A. RODRIGUEZ,<br><br>    Defendant and Appellant. | B235978<br><br>(Los Angeles County<br>Super. Ct. No. MA044680) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Hayden A. Zacky, Judge.  Affirmed.

Law Offices of Fred Browne & Associates and Fred Browne, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted defendant Carlos A. Rodriguez of one count of first degree murder in violation of Penal Code section 187, subdivision (a)[1] and two counts of attempted willful, deliberate, premeditated murder in violation of sections 664 and 187, subdivision (a).  The jury found the gang allegations within the meaning of section 186.22, subdivision (b)(1)(c) and the allegations that a principal personally used a firearm and personally and intentionally discharged a firearm which proximately caused great bodily injury and death within the meaning of section 12022.53, subdivisions (b)(c)(d) and (e) to be true.  The jury was unable to reach unanimous decisions on the allegations that defendant personally used a firearm and personally and intentionally discharged a firearm which proximately caused great bodily injury and death within the meaning of section 12022.53, subdivision (b)(c)(d).  The trial court sentenced defendant to a term of 100 years to life, consisting of 25 years to life for first degree murder plus a 25-year-to-life enhancement pursuant to section 12022.53, subdivisions (d) and (e) and two consecutive terms of life with the possibility of parole for the attempted murders, each of which was enhanced by a consecutive 25 years to life pursuant to section 12022.53, subdivisions (d) and (e).

Defendant raises numerous contentions, including insufficiency of the evidence, evidentiary error, and juror misconduct.  We affirm.

## FACTS

At approximately 3:00 p.m. on October 27, 2008, Miguel Flores, Martin Barbosa, and Martin's brother Everardo Barbosa[2] were standing across the street from Palmdale High School.  Flores saw a large SUV make a U-turn and come back toward the trio.  The SUV pulled up and stopped right next to Flores and the Barbosas.  The windows of the SUV were open.  The driver and front seat passenger were Hispanic males approximately

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We refer to Martin Barbosa and Everardo Barbosa by their first names to avoid confusion, not out of disrespect.

16 to 18 years old. Someone in the SUV asked "where you from" and Everardo, who was a member of the Crooks 13 or CKS gang, replied "CKS." Someone in the SUV yelled "Lancas" and a shooting occurred. Everardo got shot from inside the SUV and died from a gunshot wound that damaged his heart. Neither Flores nor Martin was shot.

At the time of the shooting, Everardo was standing four to 10 feet from the shooter. Flores was standing approximately 13 feet from the shooter and about a foot to the side of Everardo. Martin was behind Everardo and Flores, approximately 40 feet from the shooter. After the verbal exchange, Martin backed up behind his brother's car and ducked. Flores believed there were three to five shots fired. Martin heard one gunshot.

On January 19, 2009, Flores spoke to Los Angeles County Sheriff's Detectives Robert Gillis and Mitch Robison who showed him 17 to 18 pictures of people possibly involved in the shooting. Flores circled a photograph of Michael Romero[3] as being in the back seat of the SUV and yelling out "where you from" and "fuck them, Lancas." Flores was 100 percent sure of his identification. Flores told the detectives he was 50 percent sure that defendant was the shooter, or at least looked like him, and that the shooter was in the back seat.

Flores also admitted to Detective Gillis that he knew when he was shown the SUV hours after the shooting that it was the one from which shots were fired, but he did not tell the truth to the deputy at that time. Flores said he did not tell the truth about the SUV on the day of the shooting because he felt the police did not really care about the case. Flores confirmed that the SUV of Jose Vidal was the vehicle from which the gunshots were fired.

When Flores spoke to the detectives, when he was interviewed by the defense investigator, and in testifying previously at the preliminary hearing concerning the case, Flores said he was 100 percent certain that the shooter had a two-inch high "L" tattooed

---

[3]     Romero was charged in the information as a codefendant. He pleaded guilty, did not testify at trial and is not a party to this appeal.

on his neck.  At trial, defendant did not have an "L" tattooed on his neck but did have a tattoo of an "L" on his collarbone.

On January 22, 2009, the detectives showed Martin photographs of potential suspects.  Martin identified a photograph of Michael Romero as the person who yelled out "Lancas" from the SUV before the shooting.  Martin told Detective Gillis he was 100 percent sure of that identification.  When Martin made the photographic identification, he was not concerned about his safety.  When he testified at trial, he was concerned about his safety.  Martin did not recognize defendant at all.

In January 2009, Valentin Vidal[4] was arrested for the shooting.  After the preliminary hearing but before trial, Valentin entered into a plea agreement with the prosecution.  In exchange for truthful testimony at trial, Valentin was to be sentenced to state prison for a total of 10 years for one count of attempted murder, plus a principal-armed enhancement, plus a gang enhancement.

By the day of the shooting, Valentin and defendant had been members of the Lancas 13 gang for about three years.  Romero had been a member for approximately five years.  On October 27, 2008, Valentin was driving his brother Jose's orange and black Suburban, the top of which was faded to the point it was almost white.  Jose was not a gang member.  Prior to the shooting, Valentin picked up defendant, Romero and two non-Lancas gang members named Sneaky and Crazy to go to the park to play handball.  After playing handball as Valentin was driving the group in the Suburban past Palmdale High School, defendant repeatedly told Valentin to turn the car around.  Valentin turned the car around and pulled over to the curb.  Three young Hispanic men who Valentin took to be gang members approached the car.  Someone in the back seat yelled out "where you from" and they responded "CKS."  Defendant yelled "Lancas."  Valentin saw defendant pull out a semi-automatic handgun.  Defendant fired two to three

---

**4**    We refer to Jose Vidal and Valentin Vidal by their first names to avoid confusion, not out of disrespect.

4

shots.  After the shooting, Valentin drove away.  Defendant collected the expended shell casings that had been ejected from the handgun.

Valentin identified himself, his brother Andres, defendant, and Romero in two photos of Lancas gang members flashing gang signs taken six months to a year before the shooting.  At the time of the shooting, Lancas 13 had a rivalry with a gang named Crooks 13 because about one year beforehand, a member of Lancas got stabbed by someone from CKS.  There was a standing order from Lancas to retaliate whenever they saw a CKS gang member.

A couple of days after the shooting, Jose drove to the home of Michael Romero's mother.  Defendant, Romero, and Valentin were at the house.  Defendant asked Jose if he knew what had happened and told him to park the SUV in the garage and not take it out.  Defendant told Jose that there was an incident involving his SUV where defendant "smoked a cookie" meaning he had killed a member of CKS.

Later that same day, Jose asked Valentin about what defendant said and Valentin reluctantly told him that the day he borrowed the car, defendant and Romero called him for a ride back from the park.  He picked them up and the shooting occurred on their way back to defendant's house.  Valentin told Jose that defendant had a problem with a member of CKS because of a fight.

Detective Robert Gillis testified as the prosecution's gang expert.  He was a deputy sheriff for over 15 years and had extensive training and experience investigating, studying and interacting with criminal street gangs and their members.  In 2008, Detective Gillis was part of an extensive investigation of the Lancas 13 criminal street gang.

Lancas 13 is a criminal street gang.  In October 2008, there were about 100 members of the Lancas 13 criminal street gang.  The primary activities of the gang included shootings, narcotics trafficking, murder, carjacking, assaults and felony vandalism.  At the time of the shooting, defendant, Romero, and Valentin were all members of the Lancas 13 gang.  Detective Gillis and Valentin testified about two photographs depicting defendant with other known gang members flashing gang signs

5

and sporting gang tattoos. One of the photographs was admitted into evidence, the other was withdrawn by the prosecutor.

In early 2010, Detective Gillis overheard an audio taped conversation between defendant and his brother Mikel Mendoza. In that conversation, defendant told Mendoza that defendant was "validated." In a custodial environment, one is "validated" by proving his worth to the other south side Hispanic gang members in custody.

## DISCUSSION

### I.    Sufficiency of the Evidence to Prove Identification

Defendant contends that his convictions for murder and the attempted murders must be reversed because the evidence was insufficient to prove identification.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) "The same standard applies to the review of circumstantial evidence. [Citation.] . . . . But it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore an appellate court may not substitute its judgment for that of the jury." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138–1139.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

The evidence was more than sufficient to prove defendant's identity. Valentin testified that it was defendant who told him to turn the SUV around and to pull over next to the victims. After the gang-related exchange in which Everardo claimed the rival CKS gang, defendant pulled out a semi-automatic handgun and fired multiple shots. After the shooting, defendant collected the expended shell casings.

6

Because this evidence came from an accomplice, it had to be corroborated by other evidence connecting defendant to the commission of the crimes. Such evidence need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. The corroborating evidence may be slight and entitled to little consideration when standing alone. (*People v. Williams* (1997) 16 Cal.4th 635, 680–681.)

There was evidence independent of Valentin's testimony. Flores stated that he was 50 percent sure that a photograph of defendant depicted the shooter. He also stated that if the photograph did not depict the shooter, it "sure looks like the guy who did the shooting." Flores said the shooter had an "L" tattooed on his neck. Defendant did not have an "L" tattooed on his neck, but did have one tattooed on his collarbone.

Other corroborative evidence came from defendant's own statements. A couple of days after the shooting, defendant asked Jose if he knew what happened and told Jose to park the SUV in the garage and not take it out. Defendant told Jose that there was an incident involving his SUV where defendant "smoked a cookie" meaning he had killed a member of CKS. Evidence of defendant's statements was more than sufficient to corroborate the accomplice testimony of Valentin. (*People v. Williams, supra*, 16 Cal.4th at p. 681.)

Noting that the jury did not reach unanimous verdicts on the personal firearm use and discharge allegations, defendant contends that the verdicts convicting him of the charged crimes must have been based on finding him guilty as an aider and abettor rather than as a shooter. The jury was instructed that in order to convict defendant as an aider and abettor, the prosecution was required to prove that: (1) the perpetrator committed the crime; (2) defendant knew that the perpetrator intended to commit the crime; (3) before or during the commission of the crime, defendant intended to aid and abet the perpetrator in committing the crime; and (4) defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. If the jury's verdicts convicting defendant were premised on an aiding and abetting theory, the evidence was sufficient to support those

7

verdicts. The evidence established that it was defendant who told Valentin to turn the SUV around and to pull over next to the victims. The verbal exchange preceding the shooting showed the shooting was plainly gang related. Valentin's testimony was that defendant produced the handgun right before the shooting. After the shooting, defendant collected the expended shell casings. Defendant told Jose to park the SUV in the garage and not take it out. Defendant told Jose there was an incident involving his SUV where a member of CKS had been killed.

Such evidence was more than sufficient to support the jury's verdicts finding defendant guilty of the charged crimes under an aiding and abetting theory.

## II. Sufficiency of the Evidence of Intent to Kill Martin Barbosa

Defendant contends there is insufficient evidence he intended to kill Martin, requiring reversal of that attempted murder conviction. We disagree.

The standards governing review of insufficiency of evidence to support a criminal conviction are set forth above. (*People v. Bolin, supra*, 18 Cal.4th at p. 331; *People v. Mincey, supra*, 2 Cal.4th at p. 432; *People v. Ceja, supra*, 4 Cal.4th at pp. 1138–1139; *People v. Lindberg, supra*, 45 Cal.4th at p. 27.) If the evidence justifies a reasonable inference that the requisite state of mind existed, the verdict may not be disturbed on appeal. (*People v. Holt* (1997) 15 Cal.4th 619, 670.)

The evidence supported a reasonable inference defendant harbored either a specific intent to kill Martin or a concurrent intent to kill all three victims under a "kill zone" theory.

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Viewed in the light most favorable to the verdict, the evidence showed the following. At the time of the shooting, there was a rivalry involving violence between Lancas 13 and CKS or Crooks 13. Defendant told Vidal to turn the SUV around and pull over next to the victims. After the gang-related verbal exchange, defendant pulled out a

semi-automatic handgun and fired as many as five shots at the victims, one of which killed Everardo. Just before the shooting, all three victims were standing together. When the shots were fired, Everardo was standing four to 10 feet from the shooter. Flores was standing approximately 13 feet from the shooter and about a foot to the side of Everardo. Martin was behind Everardo and Flores, approximately 40 feet from the shooter. Martin had backed up after the verbal exchange.

Based on such evidence, the rational jury could find that defendant acted with an intent to kill all three victims and that he or his accomplice fired as many as five bullets from close range knowing that all of the victims were in the line of fire. (*People v. Smith, supra*, 37 Cal.4th at p. 747.)

The jury was also instructed it could find defendant had a concurrent intent to kill Martin on the theory he intended to kill all three victims who were in a "kill zone." "Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." (*People v. Bland* (2002) 28 Cal.4th 313, 330.) "'*Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim.'" (*People v. Perez* (2010) 50 Cal.4th 222, 232.) Given the circumstances of the shooting, if the jury found that defendant primarily wanted to kill Everardo rather than Martin, it could reasonably have found a concurrent intent to kill Martin when defendant or his accomplice fired multiple shots at all three victims and thereby created a kill zone.

Defendant relies on *People v. Leon* (2010) 181 Cal.App.4th 452 (*Leon*) to support his contention that the "kill zone" theory does not apply. In *Leon*, defendant fired a single shot into the back of a vehicle containing three people. The bullet entered the right taillight, traveled through the right back seat killing the right back seat passenger. The court found sufficient evidence to convict defendant of the murder of the back seat

9

passenger and the attempted murder of the passenger seated in the front seat directly in front of the murder victim and in the line of fire. The evidence was insufficient to support the conviction of attempted murder of the driver because, given the positioning of the occupants of the car, it was physically impossible for the single bullet to strike the driver as well as the front and back seat passengers. (*Id*. at pp. 464–465.)

As summarized above, the evidence here was that just before the shooting, the three victims were standing together. When the shots were fired, Martin was positioned 40 feet from the shooter, behind Everardo and Flores. Unlike the situation in *Leon*, here the shooter fired multiple gunshots at the three victims. Because the factual scenario in *Leon* is readily distinguishable from that presented here, *Leon* provides defendant no assistance.

### III. Failure to Dismiss Juror No. 12

Defendant contends that Juror No. 12, in violating his oath not to talk with the attorneys, parties or witnesses, committed misconduct for which he should have been discharged from the jury. Defendant claims that the court's failure to do so was an abuse of discretion and resulted in a violation of defendant's Sixth Amendment right to a trial by an impartial jury.

Before resuming the direct examination of Detective Gillis, the prosecutor informed the court and defense counsel that, as Detective Gillis was entering the courthouse that morning, a juror came up to him and said, "I know I can't talk to you now, but after the trial, I'd like to talk to you." Detective Gillis indicated he turned around and walked away and there was no further conversation.

Outside the presence of other jurors, the court questioned Juror No. 12. He said he told Detective Gillis that he wanted to talk to him after the trial, to ask him questions but not about the case. The court reminded Juror No. 12 of the admonition that the jurors are not to approach any of the parties or witnesses or attorneys. Juror No. 12 apologized and said that he did not even think about it. Upon further questioning by the court,

Juror No. 12 said that he wanted to ask Detective Gillis about gangs in the part of town in which he lived because he was not aware of it.

After Detective Gillis completed his testimony, the court held a further hearing with Juror No. 12 outside the presence of the other jurors. In response to the court's questioning, Juror No. 12 confirmed that although he had said he wanted to talk to Detective Gillis after the trial, this would not cause him to favor Detective Gillis's testimony or to be biased in his favor or against him.

Defendant claims that Juror No. 12's failure to observe the admonition not to talk to witnesses or parties, strongly suggests a lack of impartiality and the court's decision to allow him to remain on the jury cannot be said to be within the bounds of discretion. We reject the contentions.

"'A juror's inability to perform his or her functions, . . . must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citations.] . . . Moreover, under Penal Code section 1089, which allows a trial court to remove a juror on a finding of good cause, 'the determination of "good cause" in this context is one calling for the exercise of the court's discretion; and if there is any substantial evidence supporting that decision, it will be upheld on appeal.'" (*People v. Beeler* (1995) 9 Cal.4th 953, 975.)

Substantial evidence supports the trial court's determination that Juror No. 12 could fulfill his duty and we find no abuse of discretion in the trial court's denial of the defense motion to exclude Juror No. 12.

## IV.    Admission of Photographs

Defendant contends that the trial court erred in admitting photographs showing defendant with other members of the Lancas gang because such evidence was more prejudicial than probative and was cumulative. Through Valentin and Detective Gillis, the prosecution presented testimony concerning two photographs taken six months to a year before the shooting. The photographs depicted a group of young men including defendant, Valentin and Romero. Some of them were flashing gang signs and sporting gang tattoos. Detective Gillis testified he recognized the individuals as Lancas gang

11

members. The majority of the Lancas gang members depicted in the photographs had been arrested as a result of a federal wiretap investigation.

Defendant's counsel objected to the admission of the photographs as unduly prejudicial since they depicted a large group of tattooed bare-chested men looking very intimidating and threatening. Defense counsel argued that the photographs were scary and the jury would be frightened by them.

After both sides rested, the prosecution withdrew one of the photographs. The trial court admitted into evidence the other photograph over defense objection. The trial court noted that no weapons were depicted in the photograph. The court stated, "This is a gang case," and ruled that the photograph was relevant to and probative of motive and the gang enhancement allegation. The court expressly considered the photograph in light of Evidence Code section 352 and overruled the defense objection.

The trial court acted within its broad evidentiary discretion and committed no error in admitting the photograph. "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

Since the prosecution had to prove the gang allegations made pursuant to section 186.22, subdivision (b), the photograph of the "Lancas" gang members was relevant. "[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 193.) As found by the trial court, the photograph was probative in establishing motive for the shooting.

Defendant further contends that the trial court abused its discretion in allowing Detective Gillis to testify that most of the "Lancas" gang members depicted in the

photograph had been arrested and that gang members back each other up when they commit crimes. There was no objection to the testimony in the trial court.

"'"[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citation.]"'" (*People v. Williams* (2008) 43 Cal.4th 584, 620.) Defendant forfeited any claim concerning Detective Gillis's testimony on appeal by failing to object to it on any basis at trial.

## V.    Statement of Validation

Defendant contends the trial court abused its discretion in admitting evidence of a telephone conversation in which defendant stated he had been "validated" while in custody, and that such error rendered his trial fundamentally unfair and thereby violated his constitutional right to due process.

At a hearing conducted outside the presence of the jury, the prosecutor made an offer of proof that he wanted to elicit testimony from Detective Gillis that, during a telephone call, while defendant was in custody in the county jail, defendant said that he had been caught with a shank while in custody and that he had been "validated." This meant that defendant had proved himself in the custody environment and that he had connections. "Validation" refers directly to the Mexican Mafia. The prosecutor argued such evidence was relevant given evidence presented by the defense suggesting that defendant had at some point dropped out of the Lancas gang.

The court found the proposed testimony to be relevant and admissible under Evidence Code section 352. The court "sanitized" the evidence by excluding any mention of a shank and any mention of the Mexican Mafia. In the presence of the jury, Detective Gillis testified that in the early part of 2010, he overheard a conversation between defendant and his brother Mikel Mendoza. In that conversation, defendant said that he was "validated." Detective Gillis opined that within a custodial environment, it means proving your worth to the other south side Hispanic gang members that are in custody.

13

As previously stated, under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1124.) Pursuant to that standard, a trial court's ruling will not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice, or "exceeds the bounds of reason." (*People v. Valdez* (1997) 58 Cal.App.4th 494, 511.)

No such showing has been made here. In questioning prosecution witnesses and presenting evidence on his own behalf, defendant tried to show that he was in the process of having his gang tattoos removed and that he was trying to distance himself from the Lancas gang. As found by the trial court, the "sanitized" evidence of defendant's statement that he had been "validated" and what that meant was relevant and probative in countering such evidence.

## DISPOSITION

Because we find no error, there was no cumulative error.  The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

FERNS

We concur:



_____, P. J.

BOREN



_____, J.

ASHMANN-GERST

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.